Filed 9/24/19

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B289035 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA417074) |
| v. | |
| JUAN RAMIREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Leslie A. Swain, Judge. Affirmed and remanded for an amended abstract of judgment.

Law Office of Elizabeth K. Horowitz and Elizabeth K. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Nancy Lii Ladner, Deputy Attorney General, for Plaintiff and Respondent.

_____

A jury convicted Juan Ramirez of a shotgun murder. On appeal, Ramirez argues a range of errors. We hold there was no instructional error, prosecutorial misconduct, or cumulative error. Ramirez forfeited his ability-to-pay argument. There was no sentencing error. By agreement, the abstract of judgment must be amended. References are to the Penal Code.

## I

Given the verdict, the facts are these. When Ramirez was 20, his co-defendant Armando Semidey held a wedding reception at an apartment complex. Murder victim Salvador Zambrano attended, got drunk, grabbed a woman, and started fighting. Zambrano hit groom Semidey in the face and knocked him down. Guests forced Zambrano out of the complex, but he and a group gathered nearby. Ramirez heard Zambrano struck Semidey. Ramirez and four others drove to confront Zambrano and his group. Ramirez got out with a sawed-off shotgun and said "Who is the mother fucker who hit my brother, my friend?" A second fight started. Ramirez withdrew, took the shotgun back to the truck, put it inside, and stayed there. Then one of Ramirez's group told him, "Kill that mother fucker. Kill him. Kill him." Ramirez got the shotgun and fired a deadly blast into Zambrano's back.

## II

Ramirez appeals on six grounds.

## A

We independently review Ramirez's appeal about jury instructions.

A trial court must instruct the jury on general principles of law necessary for the jury's understanding of the case.

Defendants have a right to an instruction pinpointing their defense theory, but the court may refuse incorrect, argumentative, duplicative, or confusing instructions. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.)

The trial court instructed the jury about voluntary manslaughter using CALCRIM No. 570. Ramirez requested two special instructions. The trial court properly declined them.

Ramirez's first proposed special instruction stated "Provocation sufficient to reduce murder to voluntary manslaughter may accumulate over a period of time and may be based upon a series of acts." This instruction duplicated the sentence in CALCRIM No. 570 that "Sufficient provocation may occur over a short or long period of time." The main difference is the CALCRIM sentence is concise and the proposed instruction is not. The trial court rightly rejected this duplicative instruction.

Ramirez's second proposed special instruction was argumentative. This second proposal was "A defendant may witness potential acts of provocation and/or be informed of them afterwards." Nothing in CALCRIM No. 570 was to the contrary. This CALCRIM does not say Ramirez himself had to witness the provocation, or that merely being informed of the provocation was suspect or insufficient. To the contrary, the CALCRIM required only that Ramirez "was provoked," and that the provocation would have caused an average person to act from passion. Because the CALCRIM contained no restrictions on the means of provocation—eyewitness observation versus being informed by others—Ramirez's second proposal could contribute no logical content. It would simply add emphasis that would favor one side and not the other, which is to say the proposal was argumentative. The trial court correctly rejected this instruction.

## B

Ramirez's second argument is that there was prosecutorial misconduct. There was not.

Ramirez characterizes two categories of comments as prosecutorial misconduct. The first involves four comments in which Ramirez contends the prosecutor improperly equated voluntary manslaughter with justified or excused killing. Ramirez says these statements were misleading, inaccurate, and inappropriate because they implied to the jury that it would be forgiving or lenient to find Ramirez guilty of the lesser crime. The second category involves two comments where, according to Ramirez, the prosecutor implied that if a reasonable person would not kill under the circumstances of this case, the legal standard for provocation has not been met. We address each category in turn.

## 1

In closing argument, the prosecutor argued a punch did not justify the defendant shooting Zambrano in the back, and that drinking and being a "jerk" did not justify or excuse Zambrano's shooting. The prosecutor made similar arguments that "you don't get to" shoot somebody because "you heard they punched your friend or may have been rude or insulting." The trial court overruled Ramirez's objection to the third of a total of four such comments. Ramirez argues these comments conflated the law of voluntary manslaughter with a justified or excusable killing, constituting prosecutorial misconduct.

The prosecutor's comments were not prosecutorial misconduct. The prosecutor never said the law barred the jury from finding the alleged provocations caused Ramirez to act without deliberation and reflection. Instead she argued a

4

reasonable person would not have acted in the heat of passion based on what Ramirez heard and saw in this case. The first two comments were made as the prosecutor was working her way through the evidence, not when she discussed the elements of homicide and voluntary manslaughter. The third comment appears in the transcript four pages after the prosecutor stated the law of voluntary manslaughter; it was part of her argument that a reasonable person would not act in the heat of passion based on what happened here. This was her theory of the case. She was entitled to advance this theory in closing argument. The same goes for her fourth comment: that shooting Zambrano because you heard he punched your friend or was being rude at a party was first degree murder, not manslaughter.

Ramirez cites cases. According to the *Najera* case, it is acceptable for a prosecutor to say a voluntary manslaughter conviction would give a defendant a "break." (*People v. Najera* (2006) 138 Cal.App.4th 212, 220 (*Najera*).) But according to Ramirez, the *Peau* case made it unacceptable for prosecutors to call an imperfect self-defense instruction a "loophole." (*People v. Peau* (2015) 236 Cal.App.4th 823, 832 (*Peau*).)

Ramirez incorrectly argues his case is more like *Peau* than *Najera*. While explaining the elements of imperfect self-defense, the *Peau* prosecutor indeed called imperfect self-defense a "loophole." (*Peau, supra,* 236 Cal.App.4th at p. 832.) But that prosecutor went on to say "[i]mperfect self-defense doesn't apply. The defendant is not *walking out of these doors using this excuse.*" (*Ibid.*, italics added.) That prosecutor misleadingly suggested a finding of imperfect self-defense would *free* the defendant. Ramirez's prosecutor did not.

This prosecutor's comments were more like those in *Najera* than *Peau*. By arguing Ramirez's behavior was not "justified" or "excused," she may have implied the jury would be giving him a break if they reduced murder to manslaughter. That is different from implying the jury would be letting him escape all criminal punishment. And the court's jury instructions told the jury a finding of provocation could reduce the charge from murder to voluntary manslaughter, not eliminate the charges altogether. The prosecutor's comments were not improper.

2

The second category of allegedly impermissible argument involves two comments where, according to Ramirez, the prosecutor implied that, if a reasonable person would not kill under the circumstances of this case, the legal standard for provocation has not been met. It is true the standard for reducing murder to manslaughter under a heat of passion theory is not whether a reasonable person would have killed in a similar scenario, but whether a reasonable person would have acted rashly or without deliberation. (*Najera, supra,* 138 Cal.App.4th at p. 223, citing *People v. Breverman* (1998) 19 Cal.4th 142, 163.)

Ramirez has forfeited this argument on appeal. A defendant may not complain of prosecutorial misconduct on appeal absent a timely and specific objection. (*People v. Stanley* (2006) 39 Cal.4th 913, 952.) Ramirez did nothing. That is forfeiture.

Ramirez incorrectly says the doctrine of futility excused his silence. This doctrine is inapplicable. (See *People v. Clark* (2011) 52 Cal.4th 856, 960.) Ramirez argues the trial court overruled one of his objections. This does not demonstrate futility. (See *People v. Peoples* (2016) 62 Cal.4th 718, 797.)

Alternatively, Ramirez argues his counsel was ineffective because no plausible tactical reason could justify his decisions not to object. Ramirez highlights two comments by the prosecutor. The first was in the initial closing argument when the prosecutor said, "[I]t is not reasonable that [the defendants] decided to go kill Salvador Zambrano because he got drunk at a wedding reception. That is not reasonable." The second was during rebuttal, when the prosecutor stated: "Ladies and gentlemen, a person of average disposition in the same situation and knowing the same facts. You're reasonable people and think about it. You hear about a fight. You're going to go get a gun? That's not reasonable."

Ramirez argues these statements misled the jury and misstated the law. Judicial scrutiny of counsel's performance is highly deferential. (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) We presume counsel's conduct falls within the wide range of reasonable professional assistance. (*Ibid.*) Failure to object rarely amounts to constitutionally ineffective representation. (*People v. Boyette* (2002) 29 Cal.4th 381, 424.)

Many sound reasons could explain the decisions not to object to these comments. Counsel may have figured counterargument held more rhetorical promise than a mere objection. Or the jury may have looked bored, and the stimulus of an objection may have awakened the jurors' interest in a counterproductive way. And so forth. We presume defense counsel's decisions about when and whether to object were reasonable, and, based on the evidence before us, we do not second-guess his tactics.

## C

There was no cumulative error because there were no errors to cumulate.

## D

Ramirez's fourth argument concerns firearm enhancements. This argument is illogical and invalid.

Background is necessary. The jury convicted Ramirez of second degree murder and found a gun allegation to be true according to section 12022.53, subdivision (d). The People argued this dictated a sentence of 40 years to life: 15 to life for the second degree murder plus 25 to life for the gun enhancement under that section, so 15 plus 25 equals 40. At sentencing, Ramirez asked the court to strike the gun allegation, as section 12022.53, subdivision (h) allows but only when to do so would be "in the interest of justice. . . ." The court refused because it did not believe Ramirez's bad conduct justified dismissing the firearm allegation.

Ramirez bases his argument on the fact the court, while explaining why it *would not* further justice to strike this gun enhancement, commented twice Ramirez would become eligible for parole at the same time even if the court did reduce the firearm enhancement. Ramirez says that is incorrect because striking his gun enhancement *would* change his parole eligibility date. With the 25-to-life gun enhancement, Ramirez would have to wait until his *25th* year of prison to become parole-eligible. (See § 3051, subds. (b)(3), (a)(2)(B).) But if the court struck the gun enhancement, that would make the 15-to-life term the controlling offense. Section 3051 would then dictate Ramirez would be eligible for parole during his *20th* year of prison. (§ 3051, subd. (b)(2).) So the court erred, Ramirez submits, by

8

commenting that striking the gun allegation would not affect Ramirez's parole eligibility date, because striking the enhancement would make him eligible for parole at the 20 year mark instead of after 25 years.

The trial court may have gotten the parole eligibility date wrong, but that was not the reason it refused to strike the gun enhancement. Nor was that the reason the court declined to impose a lesser 10-year gun enhancement, as Ramirez's counsel also urged. (But see *People v Tirado* (2019) 38 Cal.App.5th 637, 641–644.) Rather, the trial court refused to strike the gun enhancement because Ramirez's shotgun assassination was particularly reprehensible: pensively deliberate, in the teeth of others begging him not to shoot, and cowardly: Ramirez shot Zambrano in the back. The error was irrelevant.

The court rejected leniency as contrary to justice. The fact Ramirez might get parole *earlier* than the court thought possible would not prompt a sentencing court to be more lenient under these circumstances. This illogical argument fails.

E

Ramirez erroneously contends various assessments and a fine should be vacated because he was entitled to a hearing on his ability to pay. Ramirez forfeited this contention by failing to object in the trial court. (See *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1155.)

F

Ramirez contends and the People concede the abstract of judgment does not reflect the court's order that Ramirez's liability for the restitution orders to the victims in the amount of $11,889 be joint and several with the other two defendants. The trial transcript and minute order from the sentencing hearing confirm the trial court ordered restitution to be joint and several

9

with Semidey and Rodriguez. Accordingly, the abstract of judgment must be amended.

## DISPOSITION

We direct the trial court to amend the abstract of judgment to show restitution liability is joint and several. No hearing is required. The judgment is affirmed in all other respects.


WILEY , J.


I concur:



BIGELOW, P. J.



10

**STRATTON, J., Concurring and dissenting.**

**The Requested Pinpoint Instructions**

Although I concur in the result on this issue and agree that ultimately appellant's conviction should not be reversed because the trial court refused to give the requested pinpoint instructions, I write to set forth a different perspective on whether the trial court erred in so refusing.

Our Supreme Court has consistently held that in appropriate circumstances, a trial court " 'may be required to give a requested jury instruction that pinpoints a defense theory of the case.' " (*People v. Hartsch* (2010) 49 Cal.4th 472, 500.) Pinpoint instructions " ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case." ' " (*People v. Lujano* (2017) 15 Cal.App.5th 187, 191.) A proper instruction does not pinpoint *evidence*, it pinpoints the defendant's *theory* of the case. (*People v. Ledesma* (2006) 39 Cal.4th 641, 720 (*Ledesma*).)

On request, "a criminal defendant is entitled to pinpoint instructions that relate particular facts to an element of the charged offense and highlight or explain a theory of the defense if the instructions are supported by substantial evidence." (*People v. Nelson* (2016) 1 Cal.5th 513, 542 (*Nelson*).) A pinpoint instruction must be given at a defendant's request unless it "incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30; *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 498.)

"In determining whether the evidence is sufficient to warrant a jury instruction, the court does not determine the credibility of the defense evidence, but only whether there was

1

evidence, if believed by the jury, sufficient to raise a reasonable doubt." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1418; *People v. Salas* (2006) 37 Cal.4th 967, 982.)

Here, the trial court gave the jury the following instruction on voluntary manslaughter:

> "A killing that would otherwise be a murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:
>
> > "1. The defendant was provoked;
> >
> > "2. As a result of the provocation the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;
> >
> > "AND
> >
> > "3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.
>
> "Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.
>
> "In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted in the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

2

"A desire for revenge does not qualify as a passion which would reduce a murder to voluntary manslaughter.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.

"If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

Ramirez asked the court to also give the jury two pinpoint instructions on voluntary manslaughter. The first was, "[p]rovocation sufficient to reduce murder to voluntary manslaughter may accumulate over a period of time and may be based upon a series of acts." Ramirez cited to the following authority to support his request: *People v. Le* (2007) 158 Cal.App.4th 516, 525; *People v. Wharton* (1991) 53 Cal.3d 522, 569 (*Wharton*); *People v. Berry* (1976) 18 Cal.3d 509; and *People v. Borchers* (1958) 50 Cal.2d 321. The second requested jury instruction was, "[a] defendant may witness potential acts of

3

provocation and/or be informed of them afterwards." Ramirez supported this instruction with citations to *People v. Brooks* (1986) 185 Cal.App.3d 687 (*Brooks*) and *People v. Berry*.

The court agreed the requested pinpoint instructions were accurate statements of law, but denied both requests. The court told defendant he could argue these points to the jury, but declined to include the instructions because it felt the case was "just really at the border" of justifying the standard voluntary manslaughter instruction.

Ramirez argues this was error. The People do not argue the requested instructions were inaccurate statements of the law; rather, the trial court was not required to give them because they were duplicative and unhelpful to the jury.

The requested pinpoint instructions were simple, straightforward statements of law; there was no risk of them confusing the jury. Nor were they argumentative. An instruction is argumentative if it directs the jury to consider specific evidence. (*Ledesma, supra*, 39 Cal.4th at p. 720; *Wharton, supra*, 53 Cal.3d at p. 570.) Ramirez's requested instructions did not point to specific pieces of evidence in the record, they merely pinpointed the crux of Ramirez's defense theory: that a series of provocative acts, some of which he witnessed and some of which he heard about, caused him to act in the heat of passion when he shot Zambrano. Interestingly, the trial court found no problem with and sua sponte gave a pinpoint instruction to support the People's theory of prosecution: "A desire for revenge does not qualify as a passion which would reduce a murder to voluntary manslaughter." I find Ramirez's two proposed instructions were just as mildly phrased in explicating his theory of defense.

4

Nor were the instructions duplicative. Nothing in the standard instruction given to the jury addressed the question whether murder could be reduced to voluntary manslaughter if the defendant did not witness the provocation, but learned of it afterwards. Yet, this is the state of the law. (See *Brooks*, *supra*, 185 Cal.App.3d at p. 694.)

With respect to the accumulation of provocative acts, the standard instruction indicates that provocation may occur over a long period of time, but it also states the provocation may not be remote or slight, and that the defendant must have acted in the direct and immediate influence of provocation. Ramirez's theory was that a number of provocative acts, each one of which might not be sufficient on its own to cause a reasonable person to act in the heat of passion, can build upon one another to the point where a defendant may act rashly and without due deliberation or reflection. I conclude that instructing the jury in this way does not duplicate the standard instruction that provocation cannot be remote or slight and must have exerted a direct and immediate influence upon the defendant, yet can also occur over a long period of time. In light of Ramirez's theory of the case, it is not unreasonable to conclude it would be potentially difficult for a jury to reconcile these three concepts. Ramirez was therefore entitled to an instruction informing the jury that an accumulation of otherwise "slight" provocations, some of which might be remote and some of which occurred right before or at the time of the crime, could reduce murder to voluntary manslaughter if the jury believed the sequence of provocations would prompt a reasonable person to act in the heat of passion.

The requested instructions were supported by substantial evidence. Ramirez was not present when the victim punched

Semidey; rather, he heard about this provocative act shortly after it occurred and it was definitely the event that provoked him, based on his statement "Who was the mother fucker who hit my brother, my friend?" Then he saw the victim continuing to be belligerent and disrespectful to the wedding guests when the second confrontation occurred and Zambrano and his group knocked Guzman to the ground. Ramirez also stated during his police interview that he heard some of the women at the reception had been hit by the person who caused the trouble. While these facts may not have been sufficient to provoke a reasonable person to act in the heat of passion without due deliberation and reflection, the weight to be given this evidence was within the province of the jury, not the trial court.

Nevertheless, the error does not require reversal. Reversal is required only if the court, after an examination of the entire cause, including the evidence, finds that it is reasonably probable that a result more favor to Ramirez would have been reached in the absence of the error. (*Wharton*, *supra*, 53 Cal.3d at p. 571.) The evidentiary premise of a provocation theory is the defendant's emotional reaction to the conduct of another, which may negate a requisite mental state. (*Nelson*, *supra*, 1 Cal.5th at p. 541.) The provocative conduct must be sufficient to " 'cause an ordinary person of average disposition to act rashly or without due deliberation and reflection.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 583–584.) " ' "Heat of passion arises when 'at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment.' " ' " (*Id.* at p. 584.)

There was strong and persuasive evidence that Ramirez did not act in the absence of due deliberation and reflection. He went to the corner where Zambrano and his group congregated a full 45 minutes after learning his friend had been punched at his own wedding. Furthermore, not only did witnesses observe Ramirez go back into the Avalanche after Zambrano's wife and sister-in-law pleaded with him not to shoot the gun, Ramirez himself told officers that, while in the Avalanche, he sat down and "pretty much thought what . . . I was gonna do." "And, unfortunately," he continued, "I got off the truck, and I didn't do the right thing." In acquitting Ramirez of first degree murder, the jury clearly did not find this brief respite sufficient to support premeditation and deliberation. Nevertheless, the brief respite countermands the theory that Ramirez acted in such heat of passion as to mandate a conviction of voluntary manslaughter. I cannot say it is reasonably probable that a more favorable result would have obtained absent the trial court's error.

**Firearm Enhancement**

I dissent from the majority's analysis of the trial court's exercise of discretion as to the firearm enhancement. At sentencing, Ramirez urged the court to strike the 25-year firearm enhancement the jury found true under Penal Code[1] section 12022.53, subdivision (d). Ramirez also requested that the court impose a lesser ten-year enhancement under section 12022.5[2] if

---

[1]    All further statutory references are to the Penal Code.

[2]    Section 12022.5, subdivision (a) punishes an offender who personally uses a firearm in the commission of a felony by a lesser, additional and consecutive term of 3, 4, or 10 years.

7

the court declined to strike the 25-year enhancement.[3]  The trial court did not strike the 25-year enhancement and, in articulating its decision, incorrectly stated that even if it reduced the enhancement to ten years, Ramirez would not be eligible for a youthful offender parole hearing until he had served 25 years in prison.

Section 3051, subdivision (b)(2) provides that "[a] person who was convicted of a controlling offense[4] that was committed when the person was 25 years of age or younger and for which the sentence is a life term of *less* than 25 years to life shall be eligible for release on parole by the [Parole Board] during his or her 20th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (Italics added.)  Under section 3051, subdivision (b)(3), a person under 25 who was convicted of a controlling offense carrying a life term of 25 years to life is eligible for a parole hearing during his or her 25th year of incarceration.

---

[3]     It is uncontested that the trial court could have imposed a lesser, uncharged enhancement; it is also uncontested that the trial court believed it had the authority to do so.  Indeed, our Supreme Court has "expressly permitted the substitution of a charged enhancement with an uncharged enhancement that 'would be applicable in any case' in which the charged enhancement applies."  (*People v. Fialho* (2014) 229 Cal.App.4th 1389, 1395, quoting *People v. Strickland* (1974) 11 Cal.3d 946, 961.)

[4]     The "controlling offense" is the offense or enhancement for which the court imposed the longest term of imprisonment. (§ 3051, subd. (a)(2)(B).)

Here, Ramirez's controlling offense, for the purposes of section 3051, is the 25-year firearm enhancement. That 25 years-to-life sentence subjected him to section 3051, subdivision (b)(3), that is parole consideration at his 25th year of incarceration. However, had the court chosen to impose a 10-year firearm enhancement under section 12022.5, his controlling offense would have been the second degree murder conviction for which he was sentenced to 15 years to life. He would therefore have been eligible for parole consideration after serving 20 years under section 3051, subdivision (b)(2).

The court believed incorrectly that even if it reduced the enhancement to 10 years, Ramirez would not have his parole hearing until he served 25 years in prison. The court misunderstood the impact of its decision on Ramirez's future parole eligibility date.

The People acknowledge the court misunderstood the impact of the available enhancements on Ramirez's parole eligibility date, but urge us to affirm the trial court, arguing it is clear from the court's comments the court would have imposed the 25-year enhancement even if it had not been mistaken. The People point out the trial court stated it would be inappropriate to strike the firearm enhancement in this case because Ramirez did not use the firearm reflexively; rather, he was begged not to use the gun, went back into the Avalanche, thought about what to do, and chose to shoot Zambrano in the back.

The court's statements, however, demonstrate only that the court was unwilling to strike the firearm enhancement *entirely*, not *which* firearm enhancement it believed "was best suited to this case." (*People v. Morrison* (2019) 34 Cal.App.5th 217, 223.) A court which is unaware of the scope of its discretionary powers

can no more exercise that informed discretion than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record. (*Id.* at p. 224.) Here, the court clearly misunderstood the consequences of the exercise of its discretion. This impacted its ability to exercise *informed* discretion in considering the different impact of the various available firearm enhancements on Ramirez's parole eligibility date.

I also note the court stated at sentencing that it did not believe the legislature granted the trial court discretion to strike firearm enhancements "intending that every case where there was a gun allegation would result in a court doing an aggravation versus mitigation balancing as it would as if – as it would if considering probation." While this may be technically true in that the law does not require a formal balancing of aggravating and mitigating factors when deciding whether to impose a firearm enhancement, the practical reality is that all sentencing courts consider the interplay of various statutes within a complex statutory sentencing scheme, and weigh the various options available to them in fashioning a reasonable sentence. Here, the court did just this when it stated it believed Ramirez would not get a parole hearing at 25 years regardless of which enhancement it imposed. Unfortunately, its analysis was incorrect.

I would remand to the trial court with directions to exercise its discretion whether to impose an alternative firearm enhancement in full consideration of all applicable sentencing statutes.


STRATTON, J.

10